[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10413

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 2, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 06-00068-CV-WCO-2

PETER GRAFF, as Administrator of the Estate of Michael K. Maldonado,
JESSICA MALDONADO,

Plaintiffs-Appellants,

versus

BAJA MARINE CORPORATION, MERCURY MARINE, a Division of
Brunswick Corporation, BRUNSWICK CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 2, 2009)

Before BIRCH and PRYOR, Circuit Judges, and STROM,* District Judge.

STROM, District Judge:

_____

* Honorable Lyle E. Strom, Senior United States District Judge for the District of
Nebraska, sitting by designation.

This case arises out of a boating accident that occurred on Lake Lanier on May 16, 2004, and killed the operator of the boat, Michael Maldonado. Plaintiffs filed a strict products liability action under Georgia law against Baja Marine Corporation ("Baja"), the manufacturer of the boat, and Brunswick Corporation ("Brunswick"), the manufacturer of the boat's gimbal housing,[1] for an alleged manufacturing defect in the boat's gimbal housing.[2] The district court granted Baja and Brunswick (collectively, "manufacturers") summary judgment on the ground that plaintiffs failed to offer sufficient evidence of a manufacturing defect to establish a genuine dispute for trial.

Plaintiffs appeal the district court's grant of summary judgment, the district court's exclusion of expert testimony, and the district court's imposition of sanctions. We AFFIRM.

## I. BACKGROUND

On May 16, 2004, at approximately 2:30 p.m., Maldonado drove his boat, a 25 foot Baja Outlaw, to a location on Lake Lanier called Cocktail Cove. Between 6:00 p.m. and 6:30 p.m., Maldonado and a friend, Brian Ruggerio, left Cocktail

---

[1] Brunswick manufactures the gimbal housing through its Mercury Marine division.

[2] Initially, plaintiffs asserted several theories of strict liability, but the only claim on appeal regards a manufacturing defect in the gimbal housing.

Cove in their own boats to travel to Ruggerio's lake front home. For a period of time, the two men traveled side by side in their boats at an estimated speed of 50-60 miles per hour. Eventually, Ruggerio pulled away and last observed Maldonado about 1,000 yards behind him.

After Ruggerio sped away, the accident occurred, but no eye witnesses observed the accident. Maldonado's boat was first identified by a passerby at approximately 7:30 p.m. Maldonado was not in the boat at the time it was discovered, and his body was never found.

The parties offer two competing theories as to how the accident occurred. Plaintiffs contend the boat's gimbal housing fractured under normal operating conditions due to a manufacturing defect, the boat spun out of control, and Maldonado was ejected from the boat. In contrast, the manufacturers claim the gimbal housing was properly manufactured and fractured due to an impact with the water. The manufacturers contend Maldonado's boat hit a wake, the boat went airborne, the gimbal housing fractured when the boat hit the water upon reentry, and Maldonado was ejected.

The district court granted summary judgment in favor of the manufacturers, finding no genuine dispute existed as to whether the gimbal housing contained a manufacturing defect. Plaintiffs appealed the grant of summary judgment.

Plaintiffs also appeal the district court's exclusion of expert testimony and imposition of sanctions for spoliation.

## II. STANDARD OF REVIEW

The Court reviews the exclusion of expert testimony and spoliation sanctions for abuse of discretion. United States v. Brown, 415 F.3d 1257, 1264-65 (11th Cir. 2005); Flury v. Daimler Chrysler Corp., 427 F.3d 939, 943 (11th Cir. 2005). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." Brown, 415 F.3d at 1266.

The Court reviews the district court's grant of summary judgment de novo. Acevedo v. First Union Nat'l Bank, 357 F.3d 1244, 1246-47 (11th Cir. 2004). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party. Acevedo, 357 F.3d at 1247. When a motion for summary judgment is properly made and supported, the nonmoving party may not rest on the mere denials or allegations in the pleadings, but must set

forth specific facts sufficient to raise a genuine issue for trial.  Fed. R. Civ. P.

56(e)(2).

## III. DISCUSSION

### A. Exclusion of the Tensile Test Results for Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the

failure to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779

(2d Cir. 1999).  Under Georgia law, "spoliation of critical evidence may warrant

the imposition of sanctions such as exclusion of certain evidence or outright

dismissal of the case."  Flury, 427 F.3d at 945.

In this case, the district court determined plaintiffs unquestionably spoliated

evidence and sanctions were warranted.  Accordingly, the district court excluded

the results of tensile tests[3] conducted by an individual acting at the direction of

Brian Rampolla, plaintiffs' metallurgist.

The district court did not abuse its discretion when it imposed sanctions for

spoliation.  There is no dispute plaintiffs destroyed evidence when litigation was

reasonably foreseeable.  A team hired by plaintiffs' attorneys  removed the gimbal

---

[3] "The purpose of the tensile test is to measure specific mechanical properties of yield
strength, tensile strength, and elongation."  R-167, p. 7.

housing from Maldonado's boat without notifying the manufacturers, and an individual acting at Rampolla's direction conducted destructive tensile tests on a portion of the gimbal housing without notifying the manufacturers. Notwithstanding, plaintiffs claim the district court abused its discretion in imposing sanctions.

We disagree. To determine whether spoliation sanctions are warranted, a court must consider the factors identified in Flury v. Daimler Chrysler Corp., 427 F.3d 939. Griffin v. GMAC Commercial Fin., L.L.C., No. 1:05-CV-199-WBH-GGB, 2007 WL 521907, at *3 (N.D. Ga. Feb. 15, 2007). The district court properly considered these factors and did not make a clear error in judgment when it concluded that exclusion of the tensile test results was an adequate sanction for plaintiffs' conduct.

The manufacturers suffered significant prejudice due to plaintiffs' conduct because the gimbal housing was the critical piece of evidence in this case, and the specimens tested by plaintiffs were smaller than the size mandated by the American Society of Testing Materials ("ASTM") standards for testing. As appropriately stated by the District Court, "The prejudice [was] really two-fold. First, defendants were denied the same testing opportunities as plaintiffs. Second, by wasting what little material there was by testing specimens that did not satisfy

-6-

ASTM's size requirements, Rampolla effectively prevented everyone -- plaintiffs, defendants, and the court -- from receiving more reliable test results." R-215, pp. 5-6. Even if the plaintiffs did not act with malice when they spoliated evidence, the plaintiffs were the more culpable party and caused the manufacturers substantial prejudice. See Flury, 427 F.3d at 946.

Plaintiffs contend that any prejudice suffered by the manufacturers was really self-imposed. While plaintiffs admit to destructively testing a portion of the gimbal housing, plaintiffs claim the manufacturers had the ability and opportunity to conduct tests on a different portion of the gimbal housing that remained untouched. The record indicates that the untested portion of the gimbal housing was not an optimum specimen for testing, and the district court could have properly determined that its existence did not cure the prejudice plaintiffs caused. Accordingly, the district court's decision to exclude the tensile test results is affirmed.

**B. Exclusion of Rampolla's Testimony**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Accordingly, expert testimony is admissible when three requirements are satisfied:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert;[4] and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

The proponent of the expert testimony bears the burden of proving its admissibility. Id.

To support an essential element of their products liability action, plaintiffs offered testimony of their expert metallurgist, Brian Rampolla. Rampolla's testimony sought to establish that the gimbal housing on Maldonado's boat contained a manufacturing defect because it was less ductile[5] than a properly

---

[4] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

[5] Ductility "is the ability of material to deform without fracturing." R-234, p. 123.

manufactured gimbal housing. Specifically, Rampolla opined the subject gimbal housing failed to comport with the ductility requirements contained in the manufacturer's specification, Mercury Marine material specification M-360-M.[6] Rampolla conducted visual and microscopic analyses of the gimbal housing and discovered an absence of ductile dimples at the fracture surface and a high concentration of beta phase. According to Rampolla, the lack of ductile dimples indicated the gimbal housing deviated from specifications contained in M-360-M because he would expect a properly manufactured gimbal housing to deform before fracturing and leave evidence of ductile dimples at the fracture surface. In addition, Rampolla concluded the amount of beta phase in the gimbal housing proved the product was defective because high concentrations of beta phase adversely affect ductility.

The manufacturers moved in limine to exclude Rampolla's testimony, and the district court held a <u>Daubert</u> hearing to determine the admissibility of the testimony. The district court determined Rampolla was not qualified to

---

[6] M-360-M does not specifically reference ductility. Rather, the specification prescribes the yield and tensile strengths for the gimbal housing. According to Rampolla, a gimbal housing that is manufactured in accordance with M-360-M "should be expected to behave in a ductile manner if subject to an overload condition." R-167, p. 9.

competently testify about the effects of beta phase, and the testimony lacked a sufficiently reliable foundation. Rampolla's testimony was excluded accordingly.

The district court acted within its discretion when it determined Rampolla was incompetent to testify about the effects of beta phase. "There is no bright-line rule for determining whether a given witness is qualified to offer expert testimony. Rather, the decision is inherently case-specific." Allmond v. Akal Sec., Inc., No. 4:05-cv-96, 2007 WL 988757, at *2 (M.D. Ga. March 29, 2007).

In this case, Rampolla determined that the "root cause" of the gimbal housing's defect was the presence of large numbers of beta phase platelets. Yet, Rampolla did not reach this conclusion until after an aluminum expert correctly identified the beta phase platelets and directed Rampolla to relevant literature. Initially, Rampolla identified the beta phase platelets as "cold flakes" and opined in his initial draft report that the presence of cold flakes caused the gimbal housing's defect. However, Rampolla had very limited experience working with aluminum parts such as the gimbal housing, and as a result, he forwarded pictures of the gimbal housing to an aluminum expert, JC Lind, to confirm the accuracy of Rampolla's cold flake theory. Lind informed Rampolla that the structures Rampolla identified as cold flakes were actually "typical beta phase." R-234, p. 198. Rampolla questioned whether he had "gone down the wrong path" and asked

Lind whether beta phase would have an adverse effect on ductility and requested Lind point Rampolla to literature on the topic. Id. at 199.

A little over one month later, Rampolla disclosed his final amended report. The amended report contained Rampolla's current opinion that the presence of beta phase caused the defect. Rampolla testified that he essentially deleted the words "cold flakes" in the initial draft report and replaced the words with "beta phase platelets."

Based on the foregoing, Rampolla was not an expert, let alone cognizant of the effects of beta phase, until an aluminum expert pointed Rampolla in the right direction. Further, the fact that Rampolla learned about beta phase a little over one month before he disclosed his report indicates he lacked competence on the subject. Plaintiffs contend Rampolla's failure to properly identify the beta phase platelets is not significant because beta phase, like cold flakes, are a type of intermetallic inclusion that can have an adverse effect on ductility. Plaintiffs claim Rampolla properly identified the structures as intermetallic inclusions, albeit by a different name, and correctly determined the impact of the structures on the gimbal housing's ductility. Despite plaintiffs' attempts to establish Rampolla's competence on the subject, Rampolla admitted that he did not have any experience working with beta phase prior to this case, he did not know the impact of beta

phase on ductility until one month before disclosing his report, and that cold flakes and beta phase are different structures that are easily distinguishable. We cannot say the district court abused its discretion in finding Rampolla incompetent to testify about the effects of beta phase.[7]

Further, the district court did not abuse its discretion when it excluded Rampolla's testimony on the ground that it was unreliable. Expert testimony "must be supported by appropriate validation," and the district court must ensure the testimony rests on a reliable foundation. Frazier, 387 F.3d at 1261 (quoting Daubert, 509 U.S. at 590, 597). "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Frazier, 387 F.3d at 1262 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

In this case, there were two bases for Rampolla's opinion that the gimbal housing lacked sufficient ductility: (1) the gimbal housing contained a large concentration of beta phase, and (2) the fracture surface did not exhibit evidence

_____

[7] Plaintiffs claim that even if Rampolla was incompetent to testify about the effects of beta phase, the district court should have only excluded testimony related to beta phase. We need not reach this issue because the district court did not abuse its discretion when it excluded Rampolla's testimony on the independent ground that it was unreliable.

of ductile dimples.[8]  Rampolla did not identify a reliable basis for either theory. All aluminum parts like the subject gimbal housing contain some level of beta phase, and therefore, a metallurgist would expect to find beta phase in the product. Rampolla's beta phase theory relies on his claim that the subject gimbal housing contained too much beta phase; however, Rampolla could not reliably identify how much beta phase is "too much."  Nor did Rampolla compare the subject gimbal housing with a properly manufactured gimbal housing to demonstrate how the levels of beta phase differed.  Similarly, Rampolla did not compare the subject gimbal housing with a properly manufactured gimbal housing to demonstrate how the presence of ductile dimples differed.[9]  The district court's decision to exclude Rampolla's testimony is affirmed.

## C. District Court's Grant of Summary Judgment in Favor of the Manufacturers

Under Georgia law, a plaintiff must prove two elements to prevail on a products liability claim: (1) the manufacturer's  product was "not merchantable and reasonably suited to the use intended" when sold, and (2) the product's

---

[8] Rampolla's opinions were also based on the results of tensile bar tests; however, as previously discussed, these tests were properly excluded.

[9] Rampolla did compare the gimbal housing on Maldonado's boat to the gimbal ring on Maldonado's boat.  The district court properly found that this comparison was not relevant because the gimbal ring contained different mechanical properties than the gimbal housing.

condition when sold was the proximate cause of the injury sustained.  See Ga.

Code Ann. § 51-1-11(b); Owens v. Gen. Motors Corp., 272 Ga. App. 842, 845-

846, 613 S.E.2d 651, 654 (Ga. Ct. App. 2005).  A plaintiff can establish the first

element by proving the product contained a manufacturing defect.  Jones v.

Amazing Prods., Inc., 231 F. Supp. 2d 1228, 1236 (N.D. Ga. 2002).  A

manufacturing defect is "a deviation from some objective standard or a departure

from the manufacturer's specifications established for the creation of the product."

Id.

In this case, the district court granted summary judgment against plaintiffs

because plaintiffs failed to offer sufficient evidence of a manufacturing defect to

establish a genuine issue for trial.  Plaintiffs assert two main arguments on appeal:

(1) testimony of plaintiffs' accident reconstructionists is sufficient to establish a

genuine dispute as to whether the gimbal housing contained a manufacturing

defect, and (2) plaintiffs can rely on circumstantial evidence to overcome summary

judgment.[10]  Both claims are without merit.

---

[10] Plaintiffs also appear to argue that the manufacturers' evidence establishes a genuine dispute regarding the existence of a manufacturing defect.  Plaintiffs argue the manufacturers' expert invented the wake theory, and this fact is evidence of a manufacturing defect.  We understand this argument as relevant to the probative value of any circumstantial evidence,  and the argument is considered accordingly.  Also, plaintiffs claim the fact that the manufacturers' metallurgical experts agree with Rampolla on several issues is probative.  This fact does not help plaintiffs overcome summary judgment because the experts disagree on the critical point of whether the gimbal housing was defective.

-14-

First, the testimony of plaintiffs' accident reconstructionists is insufficient to overcome summary judgment. Plaintiffs rely mainly on the testimony of Kevin Breen who determined that the "out-drive, mount, and gimbal ring experienced a sudden materials failure" during normal operation. R-173, Exh. 9, pp. 4-5. Plaintiffs rely heavily on the fact that Breen conducted a failure mode and effect analysis in which he eliminated what he determined to be all possible causes of the accident except for a sudden failure of the out-drive. Breen did not determine the cause of the sudden failure or allege that the gimbal housing was defectively manufactured. Indeed, Breen testified that he did not conduct a failure analysis to determine why a particular part broke; instead, he conducted a failure analysis only so far as it related to the sequence of accident events. While Georgia law does not require a plaintiff to identify the specific defect,[11] Breen's testimony does not sufficiently establish that the gimbal housing on Maldonado's boat deviated from a properly manufactured gimbal housing.

In actuality, plaintiffs' case relies solely on circumstantial evidence. Essentially, plaintiffs claim the gimbal housing would not have "suddenly failed" unless it contained a manufacturing defect. Georgia law permits the use of circumstantial evidence to infer a manufacturing defect in some circumstances.

_____

[11] Owens, 272 Ga. App. at 845-846, 613 S.E.2d at 654.

Firestone Tire & Rubber Co. v. King, 145 Ga. App. 840, 842, 244 S.E.2d 905, 909 (Ga. Ct. App. 1978). Reliance on circumstantial evidence is particularly appropriate where the product is destroyed or otherwise unavailable for testing. Rose v. Figgie Int'l, Inc., 229 Ga. App. 848, 851, 495 S.E.2d 77, 81 (Ga. Ct. App. 1997).

While Georgia courts have not clearly identified when a plaintiff may rely on circumstantial evidence to establish a manufacturing defect, we recognize that this case differs in important respects from the typical case in which circumstantial evidence is used to prove a defect. Foremost, the plaintiffs in this case had ample opportunity to examine and test the gimbal housing from Maldonado's boat to establish direct evidence of a defect. Second, the existence of a manufacturing defect is not the only plausible explanation for how the gimbal housing broke. At the very least, the manufacturers' theory that the gimbal housing broke when it impacted the water is a plausible explanation for the broken product.

Plaintiffs zealously argue that the expert testimony establishes the gimbal housing could not have broken under any circumstances except for a manufacturing defect, and therefore, plaintiffs claim their reliance on circumstantial evidence is appropriate. On the facts of this case, we fail to see how plaintiffs' expert, let alone any accident reconstructionist, could competently

-16-

conclude that there is only one plausible explanation for this unwitnessed accident. No one witnessed the manner in which the boat was being operated immediately prior to the accident. No one witnessed the conditions that existed immediately before the accident, and no one witnessed the accident itself. It would simply be speculation to conclude that plaintiffs' theory is the only plausible explanation for the accident.

Even if we were to assume that the plaintiffs could rely on circumstantial evidence in this case, the inference of a manufacturing defect is not probative in light of the conflicting expert testimony. See Stevenson v. Winn-Dixie Atlanta, Inc., 211 Ga. App. 572, 574, 440 S.E.2d 465, 467 (Ga. Ct. App. 1993)(stating "Circumstantial evidence is not probative against positive and uncontradicted evidence to the contrary.") Specifically, the manufacturers' expert metallurgist concluded the gimbal housing was not defective and complied with the manufacturer's specifications for ductility.

Accordingly, plaintiffs failed to offer sufficient evidence of a manufacturing defect to permit the district court to submit this case to a jury. The district court's grant of summary judgment in favor of the manufacturers is affirmed.

### IV. CONCLUSION

Based on the foregoing, the district court is affirmed as to all assignments of error.